******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EVELEIGH, J., dissenting. I respectfully dissent. Specifically, I disagree with the majority's decision to affirm the judgment of the Appellate Court and to apply a "trip-specific" approach to the question of liability coverage in this matter. In my view, both the plain language of the federally mandated MCS-90 endorsement form (MCS-90), which requires liability coverage "regardless of whether or not [the] negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere"; 49 C.F.R. § 387.15, illustration I; and the policy underlying the enactment of the Motor Carrier Act of 1980 (act), Pub. L. 96-296, § 30, 94 Stat. 793, which is to promote safety and to provide compensation for those who are injured by the negligence of those engaged in a business that is required to have liability coverage under the MCS-90, counsel against such an approach. Furthermore, because the minimum levels of financial responsibility required under the act apply to for-hire motor carriers; see 49 C.F.R. §§ 387.1 and 387.3 (a);[1] I understand the regulatory definition of "[f]or-hire carriage" to be fundamental to an analysis of liability coverage under the MCS-90. See id., § 387.5. The federal regulations define "[f]or-hire carriage" as the "*business* of transporting [property], for compensation" rather than the mere *act* of transporting property for compensation. (Emphasis added.) Id. Therefore, because Tony's Long Wharf Transport, LLC (Tony's Transport) was engaged in the business of transporting property in interstate commerce for compensation, I would conclude that the MCS-90 requires the defendant, Empire Fire and Marine Insurance Company (Empire), to provide liability coverage for the accident that injured the plaintiff, Renee Martinez.

Before addressing the merits of the majority's principal assertion in the present case, I begin by setting forth the history and public policy underlying the act. Prior to the abolition of the Interstate Commerce Commission (commission), "Congress ha[d] mandated that the [commission] issue operating permits to motor carriers only if the motor carrier ha[d] filed with the [commission] an adequate bond, insurance policy, or other type of security . . . in an amount not less than . . . the Secretary of Transportation prescribe[d] . . . ." (Internal quotation marks omitted.) *Canal Ins. Co.* v. *First General Ins. Co.*, 889 F.2d 604, 610 (5th Cir. 1989). Pursuant to this congressional mandate, in order to receive the authorization necessary to operate in interstate commerce, a motor carrier had to file with the commission proof of adequate security "conditioned to pay *any* final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance or use of motor vehicles subject to [the commission's]

regulation." (Emphasis in original; internal quotation marks omitted.) Id., 610–11. "To assure compliance with the latter regulation and the underlying congressional mandate . . . the [commission] . . . prescribed a form endorsement, [the predecessor to the MCS-90] . . . ." (Citations omitted.) Id., 611.

Although, upon its abolition, the commission's "authority to regulate carriers was transferred to the Department of Transportation," the regulations promulgated by the commission, including the requirement that the MCS-90 be attached to each insurance policy of the motor carrier, "remain[ed] in effect until new [regulations could be] promulgated." *T.H.E. Ins. Co.* v. *Larsen Intermodal Services, Inc.*, 242 F.3d 667, 672 (5th Cir. 2001); see also 49 C.F.R. § 387.7. "[T]he policy embodied in the [commission's] regulations was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers. . . . Thus, the insurer's obligations under the MCS-90 are triggered when the policy to which it is attached provides no coverage to the insured." (Citation omitted; internal quotation marks omitted.) *T.H.E. Ins. Co.* v. *Larsen Intermodal Services, Inc.*, supra, 672. The MCS-90 is "in effect, suretyship by the insurance carrier to protect the public" or, in other words, a "safety net" that "simply covers the public when other coverage is lacking." (Internal quotation marks omitted.) Id.

It is important to note that the genesis of the MCS-90 was to ensure compliance with the regulation that applied to all motor carriers that were engaged in interstate commerce and subject to the regulation. See *Canal Ins. Co.* v. *First General Ins. Co.*, supra, 889 F.2d 611. Indeed, the motor carriers could not receive a permit to engage in interstate commerce without proof of such compliance. See id., 610.

The MCS-90 provides coverage for "any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of [§§] 29 and 30 of the [act] regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." 49 C.F.R. § 387.15, illustration I. "Section 30 of the [a]ct mandate[s] that motor carriers transporting persons or property in interstate commerce with a gross weight rating of 10,000 pounds or more were required to obtain minimum levels of financial responsibility to cover public liability or property damage." (Internal quotation marks omitted.) *Travelers Indemnity Co.* v. *Western American Specialized Transportation Services, Inc.*, 235 F. Supp. 2d 522, 526 (W.D. La. 2002); see Motor Carrier Act of 1980, Pub. L. No. 96-296, § 30, 94 Stat

793; see also 49 U.S.C. § 31139 (b).[2]

Furthermore, the Secretary of Transportation is empowered to promulgate regulations "to require minimum levels of financial responsibility . . . covering public liability, property damage, and environmental restoration for the transportation of property by motor carrier" in interstate and foreign commerce. 49 U.S.C. § 31139 (b) (1). These regulations are set forth in 49 C.F.R. § 387.1 et seq., and apply to "for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce." Id., § 387.3 (a). "The purpose of these regulations is to create additional incentives to motor carriers[3] to maintain and operate their vehicles in a safe manner and to assure that motor carriers maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." (Footnote added.) Id., § 387.1.

The majority concludes that the trial court properly applied a "trip-specific analysis" and properly determined that the vehicle owned by Tony's Transport was not operating in interstate commerce at the time of the accident. Accordingly, the majority affirms the Appellate Court's judgment that Empire was not liable for the unpaid judgment on that basis. As a result, the majority does not address the issue of whether the Appellate Court properly concluded that the vehicle owned by Tony's Transport was not operating " 'for-hire' " within the meaning of the federal regulations. *Martinez* v. *Empire Fire & Marine Ins. Co.*, 151 Conn. App. 213, 215–16, 94 A.3d 711 (2014). In my view, however, the trip-specific approach creates an artificial wall to liability coverage, which is neither mandated by the relevant federal regulations nor justified under the act. Therefore, for the following reasons, I respectfully disagree with the reasoning set forth in the majority opinion.

First, in my view, the plain language of the MCS-90 counsels against the application of a trip-specific approach to determine liability coverage in a particular case. The MCS-90 provides in relevant part: "In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of [§§] 29 and 30 of the [act] *regardless of . . . whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. . . .*" (Emphasis added.) 49 C.F.R. § 387.15, illustration I. If the Secretary of Transportation had intended that liability coverage under the MCS-90 to apply only to interstate trips, language to that effect could have been inserted in 49 C.F.R. § 387.15. Rather than include such

language, however, the MCS-90 contains broad language providing that it applies regardless of the route on which negligence occurs, which reasonably encompasses an accident that occurs during an intrastate trip.

In *Heron* v. *Transportation Casualty Ins. Co.*, 274 Va. 534, 537, S.E.2d 699 (2007), the Virginia Supreme Court was faced with a similar issue and answered in the affirmative the question of "whether MCS-90 coverage extends to judgments recovered against a registered interstate motor carrier arising from negligence in the operation of a vehicle engaged in a purely intrastate haul." In *Heron*, the tractor trailer owned by the insured, an entity registered with the Federal Motor Carrier Safety Administration as an interstate motor carrier, was involved in an accident during the course of an intrastate trip to transport mulch within the state of Virginia. Id. The court reasoned that "[r]egardless of the forces that have motivated the insurance industry to adopt the language of the MCS-90 . . . the question presented to us is a simple one of interpreting the plain language of a written contract. The MCS–90 is a part of a contract between insurer and insured." Id., 539. The court further explained as follows: "The language of the MCS-90 . . . insofar as it sets forth the coverage therein provided, is clear, plain and unambiguous. In consideration of the premium, the insurer agrees to pay 'any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of [§§] 29 and 30 of the [act], regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.' " Id., 539–40.

The court concluded that because the insured "was the owner of a vehicle that was subject to the financial responsibility requirements of the [act]" and "was subject to a claim and a potential judgment for damages resulting from negligence in the operation of that vehicle," the insurer "was obligated to pay any such judgment arising from negligence in the operation of that vehicle *anywhere*." (Emphasis added.) Id., 540. The court emphasized that "[t]he contract language contain[ed] no terms limiting the coverage to the use or operation of the vehicle in interstate commerce" and declined to read such absent terms into the contract. Id.

I agree with the reasoning of the Supreme Court of Virginia. Contrary to the majority's contention, I do not read the court's decision in *Heron* to be solely based upon state insurance law principles. Prior to its application of such principles, the court determined that, pursuant to federal law, the named insured was subject to the financial responsibility requirements of §§ 29 and 30 of the act. Id. The court then limited its analysis to

the plain language contained within the four corners of the MCS-90, which is dictated by federal law. Id., 539. At no point did the court depart from the precise language set forth in the federal regulations. See 49 C.F.R. § 387.15, illustration I. In addition, I would add that the phrase "regardless of . . . whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere" in the MCS-90 must be read to enlarge insurance coverage, not restrict it. Id. Certainly, there is nothing in this language that would lead a court to mandate a trip-specific approach when determining the existence of coverage under the MCS-90. Accordingly, I would conclude that the MCS-90 applies to all vehicles operated by a registered interstate motor carrier on all trips in the course of its trucking business, including trips within a single state.

Second, contrary to the majority's conclusion, the trip-specific approach yields illogical results when applied to the inquiry of whether a particular motor carrier is "transporting property in interstate . . . commerce." Id., § 387.3 (a). The courts that have adopted a trip-specific approach to determine the applicability of liability coverage under the MCS-90 have done so by reasoning that the MCS-90 does not apply if the accident at issue occurred during a wholly intrastate trip. See, e.g., *Lyons* v. *Lancer Ins. Co.*, 681 F.3d 50, 57–60 (2d Cir. 2012), cert. denied,    U.S.   , 133 S. Ct. 1242, 185 L. Ed. 2d 178 (2013); *Canal Ins. Co.* v. *Coleman*, 625 F.3d 244, 251 (5th Cir. 2010). The application of such an approach would result in an analysis of liability coverage dependent upon whether a motor carrier in the business of transporting property in interstate commerce was actually transporting goods in interstate commerce at the time the accident occurred. Indeed, the danger to the public is neither increased nor decreased by a driver's happenstance decision to travel within a single state on a particular day.

Third, contrary to the Appellate Court's conclusion, the plain language of 49 C.F.R. § 387.3 (a) indicates that the Secretary of Transportation did not intend that a trip-specific approach be applied to determine whether a motor carrier was operating " 'for-hire' " within the meaning of the federal regulations. *Martinez* v. *Empire Fire & Marine Ins. Co.*, supra, 151 Conn. App. 222. That regulation provides that the minimum levels of financial responsibility required under the act apply "to *for-hire* motor carriers operating motor vehicles transporting property in interstate or foreign commerce." (Emphasis added.) 49 C.F.R. § 387.3 (a). As previously explained, 49 C.F.R. § 387.5 defines the term "[f]or-hire carriage" as "the *business* of transporting, for compensation, the goods or property of another." (Emphasis added.) Notably, the term "for-hire" in § 387.3 (a) modifies the term "motor carriers," rather than the term "property."[4] I understand the language

of § 387.3 (a) to indicate that the minimum levels of financial responsibility required under the act apply to motor carriers that are in the business of transporting, for compensation, goods in interstate commerce. If the nature of the trip determined whether a motor carrier was "for-hire" as contemplated by § 387.3 (a), the definition of "[f]or-hire carriage" set forth in § 387.5 would have used the term "act" rather than the term "business." Therefore, I would conclude that the nature of the motor carrier's business, rather than the nature of the trip determines whether the "for-hire" element of § 387.3 (a) is satisfied in a particular case.[5]

Finally, the policy underlying the enactment of the act fortifies my understanding of the MCS-90. The public policy of the act is to promote safety on the roads. See 49 C.F.R. § 387.1 ("[t]he purpose of these regulations is to create additional incentives to motor carriers to maintain and operate their vehicles in a safe manner"); see also *Royal Indemnity Co.* v. *Jacobsen*, 863 F. Supp. 1537, 1541–42 (D. Utah 1994) ("the purpose of the [MCS-90] was to provide financial protection to members of the public and to shippers" [emphasis omitted; internal quotation marks omitted]). "Congress enacted the [act] to deregulate the trucking industry, increase competition, reduce entry barriers, and improve quality of service. . . . Importantly, enactment of the [act] sought, in part, to address abuses that had arisen in the interstate trucking industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." (Citation omitted; internal quotation marks omitted.) *Herrod* v. *Wilshire Ins. Co.*, 499 Fed. Appx. 753, 754 (10th Cir. 2012). In my view, the majority's application of a trip-specific approach to determine liability coverage under the MCS-90 is at odds with the express policy underlying the act and the purpose of the MCS-90. It would be contrary to the remedial purpose of the act to apply a trip-specific approach, which *decreases* rather than increases the instances when coverage under the MCS-90 is triggered.

Furthermore, although I agree with the majority that it is a well settled principle of our court that the "[d]ecisions of the [United States Court of Appeals for the Second Circuit], [though] not binding on us, are particularly persuasive" when resolving issues of federal law; *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000); I must disagree with the Second Circuit in this instance. Ordinarily, I would follow the reasoning of the Second Circuit; however, it is my strong opinion that my interpretation of the relevant federal regulations in the present case furthers the purpose of the act.

In my view, the trip-specific approach creates uncertainty with respect to the applicability of the MCS-90 and, thus, increases costs for both the court and the

litigants by requiring that each case be decided upon its own specific facts. The majority, however, endorses this approach and explains that "a trip within only one state may nevertheless be considered interstate in nature if the trip is one leg of a continuous interstate movement of goods." The majority further states that "a brief pause in the movement of goods . . . will not mark the beginning of a new trip for the purposes of motor carrier regulations . . . ." It is my opinion that, because the trip-specific approach focuses on each specific trip made by a motor carrier, its resolution leads to an unworkable case-by-case analysis, which often involves a fact intensive analysis of whether the shipper intended to travel interstate. See, e.g., *Bilyou* v. *Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 223–24 (2d Cir. 2002); *Roberts* v. *Levine*, 921 F.2d 804, 812 (8th Cir. 1990). Its application raises numerous questions about when liability coverage under the MCS-90 is triggered. For example, would there be liability coverage under the MCS-90 if the shipper intended to travel interstate, but was involved in an accident on his way to a stop that entailed several hours of loading, before ever leaving the state? What if it were required to wait overnight for the vehicle to be loaded? Such artificial dichotomies should not be favored, especially when there is nothing in the act suggesting that Congress would have endorsed such an approach.

My interpretation of the definition of "[f]or-hire carriage" in 49 C.F.R. § 387.5 in this dissent, however, precludes such a fact specific examination. In my view, assuming the weight of the motor vehicle is over 10,000 pounds; see 49 C.F.R. § 387.3 (c) (1); there are only two inquiries that must be answered in the affirmative before the MCS-90 applies. First, was the entity or individual in the business of transporting property in interstate commerce? Second, did the accident at issue occur during a time that the authorized agent of the named insured was acting within the scope of his employment? If the answers to these two inquiries are in the affirmative, then I would conclude that the MCS-90 provides coverage for the accident at issue. This conclusion is supported by the requirement that a motor carrier be "for-hire" in order for it to be subject to the financial responsibility requirements of the act; id., § 387.3 (a); and the definition of "[f]or-hire carriage" set forth in the federal regulations. Id., § 387.5.

Contrary to the majority's conclusion, in my view, the vehicle operated by Tony's Transport was "subject to the financial responsibility requirements" of the act as required by the MCS-90; id., § 387.15, illustration I; and, therefore, the MCS-90 provides coverage for the accident at issue in the present case. First, there is no question that Tony's Transport engaged in the business of transporting vehicles in interstate commerce. Thus, Tony's Transport was the owner of a vehicle that was subject to the financial responsibility requirements of

the act and was required to obtain and have in effect the minimum levels of coverage set forth in the federal regulations. Id., §§ 387.3 (a) and 387.7 (a). Second, repairing tow trucks is a required part of operating a towing business. Accordingly, the employee of Tony's Transport was acting within the scope of his employment when he drove the vehicle to Hamden in order to retrieve motor vehicle parts to repair vehicles owned by Tony's Transport. Therefore, I would conclude that the vehicle that was involved in the accident in the present case was operating "for-hire" within the meaning of § 387.3, and that, therefore, the MCS-90 provided coverage for the accident. Accordingly, I would reverse the judgment of the Appellate Court.

In summary, I find nothing in the language of the act, the relevant federal regulations, or the MCS-90 to support a trip-specific analysis. The language of the MCS-90 and the relevant federal regulations is intentionally broad and should be read to support coverage. The decisions reached by the majority and the Appellate Court, in my view, frustrate the policy behind both the act and the MCS-90. Indeed, if an insured is engaged in the business of interstate shipping, such that compliance with the minimum levels of financial responsibility set forth in the federal regulations is required, it should not matter if the accident occurs during an intrastate trip.

Therefore, I respectfully dissent.

[1] Pursuant to the federal regulations, all motor carriers that operate vehicles transporting hazardous materials are subject to the financial responsibility requirements of the act, regardless of whether the motor carrier is for-hire. See 49 C.F.R. § 387.3 (b). Neither party, however, contends that Tony's Long Wharf Transport, LLC (Tony's Transport), was transporting hazardous materials at the time of the accident in the present case, or that it was in the business of transporting such materials. Therefore, in order for the MCS-90 to provide coverage for the accident at issue, Tony's Transport must be a "for-hire motor [carrier]" within the meaning of the federal regulations. See id., § 387.3 (a).

[2] Although Section 29 of the act is also referenced in the MCS-90, it is not relevant for purposes of this appeal. See *Canal Ins. Co.* v. *Coleman*, 625 F.3d 244, 248 n.5 (2010) (noting that § 29 of act was technical in nature).

[3] "Motor carrier" is defined by regulation as follows: "a for-hire motor carrier or a private motor carrier. The term includes, but is not limited to, a motor carrier's agent, officer, or representative; an employee responsible for hiring, supervising, training, assigning, or dispatching a driver; or an employee concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories." 49 C.F.R. § 387.5.

[4] I further note that 49 C.F.R. § 387.3 (a) applies to "for-hire motor carriers operating motor vehicles transporting property" in general and does not limit its application to the transportation of the property of another or for compensation, as the Appellate Court suggests. *Martinez* v. *Empire Fire & Marine Ins. Co.*, supra, 151 Conn. App. 224.

[5] I respectfully disagree with the majority's position that the text of 49 C.F.R. § 387.3 (b) supports the trial court's conclusion that the MCS-90 applies only when the motor carrier's vehicle is engaging in interstate commerce at the time of the accident. The majority reads § 387.3 (b) as limiting the application of the financial security requirements of the act "to the *intrastate* transportation of property only when the transported property is hazardous in nature . . . ." (Emphasis in original.)

That regulation provides that the act's financial responsibility requirements apply "to motor carriers operating motor vehicles transporting hazardous materials, hazardous substances, or hazardous wastes in interstate, foreign, or intrastate commerce." 49 C.F.R. § 387.3 (b). It is noteworthy that,

although § 387.3 (a) applies only to "for-hire motor carriers," § 387.3 (b) omits this term. Therefore, I read § 387.3 (b) as providing that *all* motor carriers that operate vehicles transporting hazardous materials are subject to the minimum levels of financial responsibility required under the act, regardless of whether the motor carrier is "for-hire . . . ." See footnote 1 of this dissent. In light of this distinction and my interpretation of the definition of "[f]or-hire carriage" set forth in 49 C.F.R. § 387.5, I am not persuaded by the majority's analysis.

---